IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| 714 VENTURES, INC.,<br>Plaintiff,<br><br>v.<br><br>NATIONAL OILWELL VARCO, L.P.,<br>Defendant. | Civil Action No. 15-925<br>Judge Nora Barry Fischer |

**MEMORANDUM OPINION**

I. INTRODUCTION

In this case, Plaintiff 714 Ventures, Inc. ("Plaintiff") alleges that Defendant National Oilwell Varco, L.P. ("Defendant") breached two commercial lease agreements by damaging the floor to an industrial warehouse that it was renting from Plaintiff and its predecessor and failed to repair such damage prior to departing the premises at the conclusion of the leasehold. (Docket No. 11). Presently before the Court is a motion for summary judgment filed by Defendant which is opposed by Plaintiff. (Docket Nos. 33, 39). The motion has been fully briefed and the parties, through their counsel, waived oral argument. (Docket Nos. 33-42). After careful consideration of the parties' arguments and all the evidence of record, and for the following reasons, Defendant's Motion [33] is DENIED.

II. BACKGROUND

    A.    *Relevant Facts*[1]

---

[1] The Court notes that the facts must be viewed in the light most favorable to Plaintiff and all inferences must be construed in its favor, as the non-moving party. *See Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015). In addition, Defendant failed to respond to Plaintiff's Additional Facts set forth in ¶¶ 13-23 of Docket No. 37. (*See* Docket No. 40). By operation of Local Rule 56, such facts are deemed admitted for purposes of deciding the pending motion for summary judgment. *See Polansky v. Vail Homes, Inc.*, Civ. A. No. 2016 WL 2643252, at *4

1

This case involves industrial warehouse and office space at 1349 Saw Mill Run Boulevard which is located in the South Hills area of Pittsburgh. An entity named 1301 Saw Mill Properties purchased the brick building complex in 2003. (Docket No. 38-3 at 9). The partners in 1301 Saw Mill Properties included brothers George and Larry Turner. (*Id.*). George was also the property manager, as he had an office in one of the buildings and handled the day-to-day maintenance needs of the tenants. (*Id.* at 3-4). After purchasing the property, 1301 Saw Mill Properties made substantial investments into same, including, among other things, subdividing the property into separate units with mailing addresses of 1301-1371; renovating the property; leasing some spaces to tenants; and selling some of the other parcels. (*Id.*). The renovations that were completed at the building included the installation of a pebble (or pea gravel) aggregate floor in 1349 Saw Mill Run Boulevard, the condition of which is at issue in this litigation. (*Id.*). These renovations were made for a specific tenant, Exotic Motorcar Company, which leased the property for a few years. (*Id.* at 3-4). George Turner testified that the installation of this floor cost approximately $60,000.00. (*Id.* at 4).

Saw Mill Run Properties leased 1349 Saw Mill Run Boulevard to Defendant in 2009. (Docket Nos. 34 at ¶ 2; 37 at ¶ 2). Defendant is a Houston-based company that was in this area conducting oil and gas operations in the Marcellus Shale Formation. (Docket No. 11 at ¶ 2; 13 at ¶ 2). Defendant used the space at 1349 Saw Mill Run Boulevard to maintain and repair machinery and other equipment utilized during its oil and gas operations. (Docket No. 38-3 at 6-7). The parties agree that Defendant conducted these types of activities on the property continuously from May 1, 2009 through March 31, 2015. (Docket Nos. 35 at ¶ 12; 37 at ¶ 12).

---

(W.D. Pa. May 10, 2016) ("Under Local Rule 56(E), undisputed facts 'will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.'"). However, for the reasons set forth herein, the Court finds that Defendant's motion for summary judgment must fail as a matter of law, regardless of Defendant's technical violation of the Local Rules.

Gerald Worster was Defendant's operations manager from July 2011 until the end of the lease agreement. (Docket No. 37 at ¶ 16). He was onsite and observed the condition of the floor during that period of time. (*Id.*).

Plaintiff is a real estate investment company that was incorporated in November of 2010 and is owned and operated by Eric Goldberg. (Docket No. 36-3 at 4). Plaintiff has owned several of the individual parcels within the Saw Mill Run building at various times. (*See generally*, Docket No. 38-1). It first purchased 1371 Saw Mill Run Boulevard at some point after November of 2010. (*Id.* at 2). This parcel was then leased to Defendant, which utilized that area for the same type of maintenance and repair activities that it was performing at 1349. (*Id.*). (The condition of the parcel at 1371 is not at issue in this case). Goldberg also maintained an office at the complex. (*Id.* at 9). He often ate lunch with George Turner and considered him to be a friend. (*Id.*). Through discussions with George and Larry Turner, Goldberg became aware that Saw Mill Run Properties was marketing additional parcels for sale and, after some brief negotiations, agreed to purchase 1323 and 1349. (*Id.* at 5-7).

Relevant here, Plaintiff and 1301 Saw Mill Run Properties entered into an Agreement of Sale and Purchase on August 30, 2013 (the "Agreement") wherein Plaintiff purchased the property for $400,000.00. (Docket No. 36-2). As part of the Agreement, Plaintiff agreed to lease back certain portions of the property to George and/or Larry Turner for a fee of $2,400.00 per month. (*Id.*). Defendant is not a party to the Agreement between 1301 Saw Mill Run Properties as "Seller" and Plaintiff as "Buyer." (*Id.*). The Agreement contained several provisions that bear on this dispute:

> **8. MAINTENANCE OF THE PROPERTY; BUYER'S OPTION**. Seller will maintain and make all repairs needed to keep the Property in as good condition as it is now, except for ordinary wear and tear. Seller will deliver the Property to Buyer is

3

[sic] "as is" condition. If a material change occurs in the physical condition of the property before Buyer takes possession, Buyer will have the option to: (A) terminate this Agreement, and upon termination the parties will be relieved of all obligations in this Agreement; or (B) proceed with this Agreement and pay the purchase price, and Seller will assign to Buyer any insurance proceeds to which Seller may be entitled as a result of the change in condition. To exercise this option, Buyer will give notice to Seller before settlement. If Buyer fails to give notice, Buyer will be conclusively deemed to have chosen option (B).

…

**14. INSPECTION OF PROPERTY.** Buyer is relying only on the inspection of the Property made by Buyer and is not relying on any oral statement concerning the physical condition of the Property made by Seller or any written statement concerning the physical condition of the Property given to Buyer by Seller except for written statements contained in this Agreement. Buyer is purchasing the property in "as is" condition, subject to the inspection rights listed in Paragraph 15.

**15. ADDITIONAL PROVISIONS**.
A. Within thirty (30) days after the date of this Agreement, Buyer shall have the opportunity to conduct an inspection of the Property. Seller shall provide access to the Property for the purpose of an inspection. The Buyer shall be the sole judge of whether or not the condition of the Property is satisfactory. If Buyer determines that the condition of the Property is not satisfactory, for any reason, Buyer may, on written notice to Seller received prior to thirty (30) days from the date of this Agreement, terminate this Agreement, and it shall be void for all purposes. If the written notice to terminate is not received within this thirty (30) day period, the condition of the Property shall be deemed to be acceptable, and any inspection option shall be deemed to have been waived for all purposes.
B. Buyer acknowledges that Buyer shall have, prior to closing, thoroughly inspected, and unconditionally and irrevocably approved, all elements comprising the Property and all factors related to their use and operation, including without limitation, utilities, physical and functional aspects of the Property, the construction and condition of the Property, all matters affecting and relating to title and municipal and other legal requirements, including but not limited to taxes, assessments and bonds, zoning, use permits, business permits, licenses, and similar entitlements. Buyer further acknowledges that at closing Buyer will acquire the Property in **"AS IS"** and **"WHERE IS, WITH ALL FAULTS"** condition and solely in reliance upon Buyer's own inspection and

> examination without recourse to Seller.
>
> …
>
> F. Seller shall assign to Buyer its interest in any and all lease agreements, including amendments and options, for or of the Property or any portion of the Property. At settlement, Seller shall deliver to Buyer any security deposits for said leases.

(Docket No. 36-2 at ¶¶ 8, 14-15 (emphases in original)). The Agreement also contained standard provisions related to contract interpretation including: an integration clause; a no oral modification clause; and a stipulation that the headings were not to be utilized in interpreting the terms set forth in the body. *Id.* at ¶ 23.

The original 2009 lease for 1349 Saw Mill Run Boulevard continued in operation after the sale from Saw Mill Run Properties to Plaintiff. (Docket Nos. 34 at ¶ 4; 37 at ¶ 4). Defendant maintained its tenancy and operations, and began paying rent to Plaintiff until the lease expired in 2014. (Docket No. 37 at ¶ 15). On May 5, 2014, Plaintiff and Defendant entered into a new commercial lease for the property, with a twelve month term, starting on April 1, 2014 and expiring on March 31, 2015. (Docket Nos. 34 at ¶ 8; 37 at ¶ 8). George Turner continued to maintain an office at the complex and was onsite daily throughout the duration of Defendant's tenancy. (Docket No. 37 at ¶ 20).

The parties dispute the condition of the pebble aggregate floor in 1349 including the extent of any such damage and when the damage occurred in relation to the terms of the leases. (Docket Nos. 34 at ¶ 7; 37 at ¶ 7). For his part, Goldberg admitted that prior to purchasing the property in August of 2013, he did not inspect or walk-through the building at 1349, noting the condition of the pebble aggregate floor. (Docket No. 38-1 at 9). He believed that he was in the parcel before the purchase due to his presence in various other parcels, his familiarity with the building generally and his many interactions with George Turner. (*Id.*). Goldberg was also aware of the type of work that Defendant performed as he had leased 1371 for a few years. (*Id.*

at 2). From his perspective, George Turner testified that the condition of the floor worsened over the period of time that Defendant leased the property. (Docket No. 37 at ¶¶ 20, 23). Defendant's operations manager, Gerald Worster, explained that when he arrived on site in July of 2011, he observed some defects in the floor, including that it was dirty, had some grease stains and portions of the floor were missing pebble gravel. (Docket No. 38-2 at 4-6). Turner also explained that Worster told him if Defendant damaged anything in the property that it would take care of the problems. (Docket No. 37 at ¶ 21). Turner added that most of the damage to the floor occurred after Plaintiff purchased the property in August of 2013 as he observed that Defendant began to do much heavier work at the site. (*Id.* at ¶ 22). At this point in time, Turner believes that the oil and gas market had contracted and observed that Defendant had started to cut costs in its business operations, including dealings with his own company. (Docket No. 38-4 at 8-9). He explained that these issues caused Defendant's employees to pay less attention to attempting to clean and care for the floor of 1349. (*Id.*).

Plaintiff obtained an estimate of $137,500.00 to repair the floor from Three Rivers Dismantlement. (Docket No. 1-3). Plaintiff forwarded the estimate to Defendant's representatives on January 29, 2015 and demanded payment, which was refused. (Docket No. 1-2). After Defendant left the property, Plaintiff leased the space to a towing company. (Docket No. 36-3 at 7-8). This litigation ensued.

B. *Procedural History*

Plaintiff filed this case on June 19, 2015 in the Court of Common Pleas of Allegheny County and Defendant removed the action to this Court on July 16, 2015. (Docket No. 1). In response to a motion to dismiss filed by Defendant, Plaintiff submitted an Amended Complaint on August 20, 2015. (Docket Nos. 9, 10, 11). The parties' efforts at resolving the matter

through Court-ordered mediation were unsuccessful and the case continued through discovery, which ended on March 30, 2016. (Docket Nos. 19, 32). Thereafter, Defendant submitted the pending motion for summary judgment, supporting brief, concise statement of material facts and appendix on May 2, 2016. (Docket Nos. 33-36). Plaintiff responded on June 1, 2016 by filing its responsive concise statement of material facts appendix and opposing brief. (Docket Nos. 37-39). Defendant replied on June 14, 2016. (Docket No. 40). Plaintiff then filed its sur-reply on June 28, 2016. (Docket No. 42). Oral argument was initially scheduled for July 11, 2016. (Docket No. 30). However, the parties waived oral argument through their respective counsel, and agreed to submit the matter to the Court on the briefs. (Docket No. 41). Accordingly, as the motion is now fully briefed, it is ripe for disposition.

III. LEGAL STANDARD

A grant of summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Heffernan v. City of Paterson*, 777 F.3d 147, 151 (3d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). A genuine dispute of material fact is one that could affect the outcome of litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). However, "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'" *N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine disputes. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing

7

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 – 24 (1986)). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine dispute, in rebuttal. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). When considering the parties' arguments, the Court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). Further, the benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats Co.*, 434 F.App'x 139, 141 n. 4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F. 3d 195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, depositions, admissions, and/or interrogatory answers to demonstrate the existence of a genuine dispute. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324).

IV. DISCUSSION

Defendant raises two related theories in support of its motion for summary judgment: (1) Plaintiff released any claims for damages to the floor prior to its August 2013 purchase due to the "as is" provision in its Agreement with 1301 Saw Mill Properties; and (2) Plaintiff's claims for damages of $137,500.00 are speculative and unsupported because Plaintiff allegedly cannot link the floor damage to the post-August 2013 activities of Defendant at the site. (Docket Nos. 34, 40). Plaintiff responds that it acquired the initial lease between Defendant and Saw Mill

Properties via assignment as part of the Agreement to purchase the property and that it obtained sufficient evidence during discovery to meet its burden to raise a genuine dispute of material fact to support its claim for damages. (Docket Nos. 39, 42). Having carefully considered the parties' arguments, the Court agrees with Plaintiff's position and will deny the motion for summary judgment. The Court now addresses each of Defendant's arguments, in turn.

*A. Applicability of the "As Is" Provision in the Agreement*

Before directly addressing the merits of the parties' positions as to the import of the "as is" provision in the Agreement on Plaintiff's breach of contract claim in this matter, the Court must first look to a few threshold procedural and substantive legal principles.

Initially, Defendant's reliance upon the purported release in the Agreement is an affirmative defense to Plaintiff's breach of contract claim alleging that Defendant breached both the 2009 and 2014 commercial leases. (*See* Docket No. 34). When a party moves for summary judgment on an affirmative defense, "it must show that it has produced enough evidence to support the findings of fact necessary to win" at trial and that "a reasonable juror would be compelled to find its way on the facts needed to rule in its favor on the law." *El v. Southeastern Pennsylvania Trans. Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007) (citations omitted). Given same, Defendant can only obtain summary judgment through a showing that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law as to every element of the affirmative defense. *Id.*

Additionally, the parties agree that Pennsylvania law applies to the substantive claims and defenses in this litigation as well as the interpretation of the Agreement, all of which relate to real property situated within the Commonwealth. (*See* Docket Nos. 34, 39, 40, 42). Further, Defendant is not a party to the Agreement that it is seeking to enforce; rather, it claims to be a

third party beneficiary of the Agreement. (*Id.*). Pennsylvania courts have held that "[i]n order for a third party beneficiary to have standing to recover on a contract, both contracting parties must have expressed an intention that the third party be a beneficiary, and that intention must have affirmatively appeared in the contract itself." *Kirschner v. K & L Gates LLP*, 46 A.3d 737, 762 (Pa. Super. Ct. 2012), *appeal denied*, 65 A.3d 414 (Pa. 2013). Hence, Defendant has the burden to show both that there are no genuine disputes of material fact <u>and</u> it is an intended third party beneficiary of the "as is" provision in the Agreement between Plaintiff and Saw Mill Properties. *See e.g., Urban Redev. Auth. of Pittsburgh v. KML Sales, Inc.*, 391 Pa. Super 92, 570 A.2d 528, n.4 (Pa. Super. Ct. 1990).

With respect to contract interpretation, "[i]n Pennsylvania, it is well settled that the effect of a release is to be determined by the ordinary meaning of its language," and that releases are to be interpreted in accordance with general contractual principles. *Taylor v. Solberg*, 566 Pa. 150, 155-56, 778 A.2d 664, 667-68 (2001) (citations omitted). As this Court has previously held:

> Pennsylvania rules of contract interpretation require this Court to "ascertain and give effect to the intent of the contracting parties." *Murphy v. Duquesne University*, 565 Pa. 571, 777 A.2d 418, 429 (Pa. 2001). Such intent is to be determined from reading the entire agreement as a whole and "[c]ourts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed." *Murphy*, 777 A.2d at 429 (citations omitted). One part of a contract cannot be interpreted so as to annul another part, and a contract must be construed, if possible, to give effect to all of its terms. *Capek v. Devito*, 564 Pa. 267, 767 A.2d 1047, 1050 (Pa. 2001); *Cerceo v. DeMarco*, 391 Pa. 157, 137 A.2d 296, 298 (Pa. 1958); *Flatley v. Penman*, 429 Pa.Super. 517, 632 A.2d 1342, 1344 (Pa. Super. 1993), *appeal denied*, 537 Pa. 620, 641 A.2d 586 (Pa. 1994); *Second Federal Sav. and Loan Ass'n. v. Brennan*, 409 Pa.Super. 581, 598 A.2d 997, 1000 (Pa. Super.1991). Clauses that seem in conflict must be construed, where possible, as consistent with one another. [*Flatley by Flatley v. Penman*, 632 A.2d 1342, 1344 (Pa. Super. Ct. 1993)] ("Clauses in a contract should not be read as independent agreements thrown together without any

> consideration of their combined effect.").
>
> "When a writing is clear and unequivocal, its meaning must be determined by its contents alone." *Murphy*, 777 A.2d at 429 (internal quotation omitted). If the terms of a contract are unambiguous, the plain meaning of the terms of the agreement will be enforced. *Id.* To this end, Pennsylvania courts generally enforce the unambiguous terms of agreements between sophisticated parties that are freely negotiated at arm's length in order to allow the parties to such agreements the benefits of their bargains. *See McMullen v. Kutz*, 603 Pa. 602, 985 A.2d 769, 778 (Pa.2009) ("freely negotiated agreements entered into at arm's length are generally enforced according to their terms to allow parties the benefit of their bargains."); *see also John B. Conomos, Inc. v. Sun, Inc.*, 831 A.2d 696, 708 (Pa. Super. Ct. 2003) ("courts should not [generally] set aside terms on which sophisticated parties agreed.").

*Westmoreland Opportunity Fund, L.L.C. v. Zappala*, No. 2:13-CV-456, 2014 WL 3420129, at *5 (W.D. Pa. July 11, 2014).

Returning to the merits, Defendant points to two non-binding decisions of the Pennsylvania Superior Court in support of its position, i.e., *PBS Coals, Inc. v. Burnham Coal Co.*, 384 Pa. Super. 323, 558 A.2d 562 (Pa. Super. Ct. 1989) and *Barker v. Dahlkemper Landscape Architects & Contractors, Inc.*, 2014 WL 10788863, at *4-6 (Pa. Super. Ct. 2014) (unpublished). Plaintiff counters that both cases are distinguishable and that the defense motion for summary judgment should be denied. (Docket Nos. 39, 42). Having reviewed the cited decisions in light of the contractual principles noted above, and the relevant provisions of the Agreement, the Court finds that Defendant is not a third party beneficiary to the "as is" provision in the Agreement. Hence, its motion for summary judgment must be denied. The Court reaches this result for several reasons.

First, the Court agrees that *PBS Coals* and *Barker* are factually distinct from this matter as the contracts at issue in those cases did not involve both an "as is" sales agreement between a

buyer and seller and a corresponding assignment of an existing lease, as are clearly set forth in ¶¶ 8, 14, 15.B and 15.F of the Agreement between Plaintiff and Saw Mill Properties. (*See* Docket No. 36-2 at ¶¶ 15.B, 15.F). *PBS Coals* involved the non-liability of a seller to a buyer for breaches of warranty due to an "as is" purchase agreement between those parties. *See PBS Coals*, 384 Pa. Super. 323. The *Barker* Court found that a landscape architect was a third party beneficiary of the "as is" sales agreement between the buyer and seller, holding that it was not liable for damage to a retaining wall – but there was no corresponding assignment language in the sales agreement. *Barker*, 2014 WL 10788863, at *4-6. Hence, neither decision is directly on point with the present circumstances.

Second, while it is true that a nonparty to an agreement may be released from liability under Pennsylvania law, such instances are limited to situations where the terms and conditions of the release are broadly drafted to release all claims as to any and all parties, *see Taylor*, 566 Pa. at 155-56, or when the language of the release makes clear that the non-party is an intended beneficiary, *see Kirschner*, 46 A.3d at 762. In this Court's estimation, the language of ¶ 15.B is not broad and all-encompassing but expressly limits Saw Mill Properties' liability for breaches of warranties to the buyer, Plaintiff, not unnamed third parties. (*See* Docket No. 36-2 at ¶ 15.B. ("Buyer further acknowledges that at closing Buyer will acquire the Property in 'AS IS' and 'WHERE IS, WITH ALL FAULTS' condition and solely in reliance upon Buyer's own inspection and examination without recourse to Seller")). The plain language of ¶ 14 expressly states that it is limited by ¶ 15. (*See* Docket No. 36-2 at 14 ("Buyer is purchasing the property in "as is" condition, subject to the inspection rights listed in Paragraph 15.")). And, to the extent that ¶ 8 is not expressly limited, such provision must be read consistently with the limitations set forth in ¶¶ 14 and 15.B. *See Flatley*, 632 A.2d at 1344. This interpretation of the "as is"

12

provision is also consistent with the Superior Court's decision in *PBS Coals*, wherein the Court explained:

> [...] the agreement contained a term which has common meaning; when something is accepted "as is" the buyer is put on notice that there may be liabilities attendant to the purchase. The warranties which may otherwise be implied by law do not attach when the buyer agrees to accept the [property] in the condition in which [it is] found. [ ... ] If [a party intends] to avoid any potential liability arising from the purchase of [property], it [is] necessary to bargain for a clause to that effect before executing the agreement.

*PBS Coals, Inc.*, 384 Pa. Super. at 328.

Third, the provisions set forth in ¶¶ 8, 14, 15.B and 15.F of the Agreement must be read in tandem, *see Flatley*, 632 A.2d at 1344, and the "as is" clause cannot be read to annul the assignment language at ¶ 15.F, *see Capek*, 767 A.2d at 1050. It is well established that upon a valid assignment, "the assignee stands in the shoes of the assignor and assumes all of his rights" including causes of action. *American Soc. for Testing & Materials v. Corrpro Co. Inc.*, 292 F. Supp. 2d 713, 718 (E.D. Pa. Nov. 20, 2003). Defendant does not contest the validity of the assignment. (Docket No. 40 at 2 ("Defendant does not dispute Plaintiff's ability, as an assignee, to pursue certain claims arising out of the 2009 lease.")). Thus, the presence of the assignment clause at ¶ 15.F. through which the 2009 lease was assigned to Plaintiff, including any corresponding causes of action, defeats Defendant's contention that it is an intended beneficiary of the "as is" clause.

All told, it is this Court's opinion that the "as is" and assignment clauses, read together in accordance with the applicable canons of contract interpretation noted above, simply mean that Plaintiff was purchasing the property in "as is" condition, without any recourse (or liability) to Saw Mill Properties for breaches of warranty arising from the condition of the property and that Saw Mill Properties assigned all of its rights under the 2009 lease to Plaintiff, including any

13

potential cause of action against its tenant, Defendant, for breaching the lease by damaging the floor, as is alleged here. (*See* Docket No. 36-2 at ¶¶ 8, 14, 15.B., 15.F). Defendant has failed to demonstrate that it is an intended beneficiary of the "as is" clause. *See Urban Redev. Auth. of Pittsburgh*, 391 Pa. Super at 99, n.4 ("Though KML is certainly an intended third party beneficiary of the contract for the sale of the produce terminal with regard to enforcement of the provisions of the written lease, equally certain is the fact the KML is not an intended beneficiary of the contract with regard to the "as is" purchase provision. Therefore, KML has no authority to enforce the "as is" provision of the contract."). Accordingly, Defendant cannot meet its burden to demonstrate that a reasonable juror would be compelled to find in its favor. *El*, 479 F.3d at 238.

For these reasons, Defendant's motion for summary judgment is denied insofar as it contends that the Agreement between Plaintiff and Saw Mill Properties bars the breach of contract claims prior to August of 2013.

### B. *Sufficiency of Evidence as to Damages*

Defendant also maintains that summary judgment is appropriate because Plaintiff's damages evidence is allegedly speculative as it cannot link the damage to the pebble aggregate floor to the post-August 2013 activities conducted by Defendant at 1349 Saw Mill Run Boulevard. (Docket Nos. 34, 40). Plaintiff contends that the evidence of record demonstrates that it has set forth a *prima facie* case of damages resulting from the alleged breach of the 2009 and 2014 lease agreements and that there are genuine disputes of material fact which otherwise preclude summary judgment. (Docket Nos. 39, 42). After reviewing the parties' arguments, the Court once again finds in favor of Plaintiff.

At the outset, to the extent that Defendant's argument on the sufficiency of the damages

evidence relies upon its now-overruled position on liability that claims prior to August of 2013 are barred by the Agreement, it must likewise be denied. (*See* § IV.A., *supra*). The Court further holds that Plaintiff has introduced sufficient evidence into the record to move this case beyond the summary judgment stage as there are genuine disputes of material fact regarding the factual predicate of the damages claim.

"To prove a breach of contract claim under Pennsylvania law, a plaintiff must demonstrate (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Haywood v. Univ. of Pittsburgh*, 976 F. Supp. 2d 606, 625 (W.D. Pa. 2013) (citing *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003)). Defendant does not contest that Plaintiff has produced sufficient evidence to support the first two elements of its breach of contract claims, i.e., the existence of the 2009 and 2014 leases and breaches of duties imposed by those contracts. (*See* Docket Nos. 34, 40). Hence, only the third element, resultant damages, is at issue.

> "To prove damages, a plaintiff must give a factfinder evidence from which damages may be calculated to a 'reasonable certainty.'" *Ware*, 322 F.3d at 225-26 (quoting *ATACS Corp. v. Trans World Commc'n, Inc.*, 155 F.3d 659, 668 (3d Cir.)). "At a minimum, reasonable certainty embraces a rough calculation that is not 'too speculative, vague or contingent' upon some unknown factor." *Ware*, 322 F.3d at 226 (quoting *ATACS Corp.*, 155 F.3d at 669).

*Haywood*, 976 F. Supp. 2d at 638–39.

Having reviewed the evidence of record in the light most favorable to Plaintiff and drawing all reasonable inferences in its favor, the Court holds that there are genuine disputes of material fact as to the resultant damages in this case. To this end, the parties dispute the extent of the damage to the pebble aggregate floor caused by Defendant's maintenance and repair operations. (Docket Nos. 34 at ¶ 7; 37 at ¶ 7). Turner testified that he was in the property daily

throughout the duration of the leasehold, i.e. from 2009 through March of 2015, and that the condition of the floor worsened over time, particularly with respect to heavier activities conducted by Defendant after 2013. (Docket No. 37 at ¶¶ 20, 23). Worster testified that when he arrived in July of 2011, the floor had already sustained some damage as it was dirty, had some grease stains and portions of the floor were missing pebble gravel. (Docket No. 38-2 at 4-6). Goldberg admitted that he did not conduct a walk-through or an inspection of the property prior to his company's purchase of same in August of 2013 but he took pictures of the floor's condition in 2015. (Docket Nos. 38-1 at 9; 36-3 at 7-8). Neither Plaintiff nor its predecessor took any formal action against Defendant with respect to the floor until January of 2015, near the conclusion of the 2014 lease. (Docket Nos. 1-2; 1-3). However, Turner explained that he pointed out the floor damage to Worster and was told that Defendant would take care of any issues. (Docket No. 37 at ¶ 21). Overall, these underlying factual disputes present credibility questions that a jury must resolve. *See Santini*, 795 F.3d at 416.

With respect to the amount of damages, Plaintiff has presented sufficient evidence to show its damages to a "reasonable certainty," as is required. *Ware*, 322 F.3d at 225-26. However, the factual predicate underlying the damages claim is also disputed, requiring the resolution of credibility issues prior to awarding a judgment on the issue of damages. *See Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (citation omitted) ("In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence."). In this regard, Turner testified that the pebble aggregate floor was installed in 2005 at a cost of approximately $60,000.00. (Docket No. 38-3 at 4). Plaintiff obtained an estimate in 2015 to repair the floor from Three Rivers Dismantlement for $137,500.00. (Docket No. 1-3). Yet, Plaintiff has not repaired or replaced

the floor and rented the property to another tenant, a towing company, subsequent to the expiration of Defendant's lease. (Docket No. 36-3 at 7-8). Hence, there are genuine disputes of material fact as to the resultant damages in this case and the motion for summary judgment must be denied. *See Marino*, 358 F.3d at 247.

V.  CONCLUSION

Based on the foregoing, Defendant's Motion [33] is denied. An appropriate Order follows.

    *s/Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge

Dated: October 11, 2016

cc/ecf: all counsel of record